IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ROSALIND JACKSON,            )
                             )
        Plaintiff,            )
                             )   Civil Action No. 15-230
    v.                       )
                             )   Judge Nora Barry Fischer
PNC BANK,                    )
                             )
        Defendant            )

**MEMORANDUM OPINION**

I. **Introduction**

Plaintiff Rosalind Jackson ("Jackson") alleges that Defendant PNC Bank ("PNC") violated Title VII of the Civil Rights Act of 1964 ("Title VII"). (Docket No. 15). Jackson, who is proceeding pro se, contends that PNC terminated her on the basis of race. (*Id.* at ¶ 1). She further claims that PNC's failure to promote her to a position as a Funds Transfer Work Leader (the "Position") was the product of race discrimination. (*Id.* at ¶ 2). PNC counters that it terminated Jackson for breaching its code of conduct and that it did not promote her because she did not apply for the Position. (Docket No. 26 at ¶¶ 1-2).

Presently before the Court is PNC's Motion for Summary Judgment. (Docket No. 47). PNC submitted a brief in support (Docket No. 48), a concise statement of material facts (Docket No. 49), an appendix attached to its brief in support (Docket No. 51), and a reply brief (Docket No. 56). Jackson submitted two responses to PNC's briefs. (Docket Nos. 53, 57). The Court heard oral argument on September 27, 2016. (Docket Nos. 58, 59). PNC argues that Jackson has failed to present sufficient evidence to support either of her claims of race discrimination because: (1) she has not identified any comparator employees who were similarly situated to her and treated more favorably by PNC; and (2) she did not apply for the Position. Jackson contends

that her claims are properly supported by the record despite not submitting discovery requests to PNC. Upon consideration of the parties' filings and for the following reasons, PNC's Motion for Summary Judgment (Docket No. 47) will be granted as to Jackson's unlawful-termination count but will be denied as to Jackson's failure-to-promote count.

## II.     Background

### A.     Local Rule 56.1 Violation

As an initial matter, the Court notes that Jackson has failed to properly respond to PNC's Concise Statement of Material Facts, (Docket No. 49), as required by Local Rule 56.C.1. This rule requires non-moving parties to a motion for summary judgment to file their own concise statement responding to each numbered paragraph in the movant's concise statement. *See* LCvR 56.C.1. The non-moving party's concise statement must admit or deny the facts contained in the movant's concise statement; set forth the basis for denial if any fact within the movant's concise statement is not entirely admitted by the non-moving party, with appropriate citation to the record; and set forth, in separately numbered paragraphs, any other material facts at issue. *See id.*

A non-moving party faces severe consequences for not properly responding to a moving party's concise statement. Any alleged material facts "set forth in the moving party's Concise Statement of Material Facts . . . which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party." LCvR 56.E. Jackson did not specifically reply to each paragraph in PNC's concise statement in either of her responses to PNC's summary-judgment motion. (Docket Nos. 53, 57).

Courts provide some leniency to pro se litigants when applying procedural rules. *Mala v. Crown Bay Marina, Inc.,* 704 F.3d 239, 244 (3d Cir. 2013) ("[W]e tend to be flexible when applying procedural rules to pro se litigants, especially when interpreting their pleadings."). However, the Court "'is under no duty to provide personal instruction on courtroom procedure or to perform any legal chores for the [pro se litigant] that counsel would normally carry out.'" *Id.* (quoting *Pliler v. Ford*, 542 U.S. 225, 231 (2004)). Pro se litigants must adhere to procedural rules as would parties assisted by counsel. *McNeil v. United States*, 508 U.S. 106, 113 (1993) (explaining that "we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel").

This Court "requires strict compliance with the provisions of [Local Rule 56]." *E.E.O.C. v. U.S. Steel Corp.*, No. 2:10-CV-1284, 2013 U.S. Dist. LEXIS 22748, at *4 n.1 (W.D. Pa. Feb. 20, 2013) (internal quotations omitted); *see also* Practices and Procedures of Judge Nora Barry Fischer § II.E.(i), Effective Mar. 23, 2010, *available at* http://www.pawd.uscourts.gov/Documents/Judge/fischer_pp.pdf. Accordingly, to the extent Jackson's allegations of facts contained in her pro se responses do not address a particular concise statement of material fact by PNC, that concise statement of material fact will be deemed admitted. LCvR 56.E; *see also Boyd v. Citizens Bank of Pa., Inc.*, No. 12-CV-332, 2014 U.S. Dist. LEXIS 70210, at **7-8 (W.D. Pa. May 22, 2014) (applying Local Rule 56.E and explaining that "to the extent [the pro se] Plaintiff's recitation of the facts do not specifically address Defendant's statement of facts, Defendant's statement will be deemed admitted"). The Court will consider any facts properly alleged in Jackson's pro se responses that specifically contradict PNC's statement of facts. *See Boyd*, 2014 U.S. Dist. LEXIS 70210, at **7-8 (stating that "[t]o the extent Plaintiff's statement

of 'fact' specifically controverts Defendant's, the Court will consider these facts in determining whether summary judgment should be granted").

**B.     Facts**

*1.     Jackson's Job Duties and Termination*

Jackson is African American and worked for PNC as a Funds Transfer Representative on PNC's Automated Clearing House ("ACH") Returns team. (Docket No. 49 at ¶¶ 2-3). ACH transactions allow consumers to directly debit their bank accounts to pay bills. (*Id.* at ¶ 8). ACH return transactions are processed when a consumer disputes unauthorized electronic payments. (*Id.* at ¶ 9). Jackson processed ACH return transactions for PNC. (*Id.* at ¶¶ 9). Jalaine Gethers ("Gethers"), an African-American whom Jackson describes as a friend, served as a "Team Lead" on the ACH Returns team. (*Id.* at ¶¶ 5-6). Jackson's immediate supervisor was Amy Yates ("Yates"), who is white. (*Id.* at ¶ 7; Docket No. 51-1 at 5). Above Yates was Duane Fahrion ("Fahrion"), Operations Manager for PNC's ACH Returns, Reconcilement, Government Processing, and Compliance functions. (Docket No. 49 at ¶¶ 4, 7).

Consumers disputing debits to their PNC accounts must follow PNC's procedures. (*Id.* at ¶ 10). The consumer must initiate the dispute by visiting a retail bank branch, contacting PNC's National Financial Service Center ("NFSC"), or using PNC's online-banking system. (*Id.*). PNC then asks the consumer questions to gather information regarding the dispute and enters the information into its Customer Relationship Inquiry Service System ("CRISS"). (*Id.* at ¶ 11). Next, the consumer must complete and sign a Written Statement of Unauthorized or Improper Debit ("WSUD"), which is then mailed or faxed to the ACH Returns team. (*Id.* at ¶¶ 12-13).

4

Because ACH transactions are regulated by the Federal Reserve through a group of regulations called "Reg E," PNC's Reg E Dispute Resolution Group ("Reg E Group") investigates consumer return transactions. (*Id.* at ¶ 14). In conducting its investigations, the Reg E Group evaluates information previously entered into the CRISS system about the transaction and then communicates through CRISS to discuss the dispute with the ACH Returns team. (*Id.* at ¶ 16). Written procedures, which Jackson "helped write," require the ACH Returns team to review the Reg E Group's notes entered in CRISS. (*Id.* at ¶¶ 17-18). The ACH Returns team then processes the return transaction for the consumer after the Reg E Group provides its permission. (*Id.* at ¶ 19). PNC employees with bank accounts at PNC must follow the same procedures as any other PNC consumer to initiate an ACH return transaction. (*Id.* at ¶ 21).

Jackson, who had a personal checking account with PNC, did not follow PNC's procedures to reverse transactions on her own personal account. (*Id.* at ¶¶ 22-28). While on vacation on July 25, 2013, Jackson called Gethers and asked if she could come to the office and complete two WSUDs to reverse two transactions. (*Id.* at ¶ 23; Docket No. 51-3 at 14). She alleges that Yates was present in the office and did not prevent her from reversing the transactions. (Docket No. 51-1 at 52). Gethers processed the transactions. (Docket No. 49 at ¶ 26). Because Jackson did not initiate her ACH transactions by going to a retail branch or contacting the NFSC, information regarding the return transaction was not entered into CRISS, and the transactions were not sent to the Reg E Group for investigation. (*Id.* at ¶ 28).

After Yates learned that Gethers had processed return transactions for Jackson, she contacted PNC's Employee Relations Information Center ("ERIC") and reported that Jackson and Gethers may have circumvented ACH's procedures. (*Id.* at ¶¶ 29-31). PNC Senior Employee Relations Investigator Jean Olenak ("Olenak") began an investigation. (*Id.* at ¶ 32).

When Olenak spoke with Gethers and Jackson, they both admitted that the return transactions at issue occurred. (*Id.* at ¶¶ 34-35). Jackson also conceded that she did not go to a retail branch or contact the NFSC. (*Id.* at ¶ 35). Subsequently, Olenak placed Jackson and Gethers on administrative leave while she completed the investigation. (*Id.* at ¶ 36). Olenak found that Gethers had processed at least nine return transactions for Jackson between May and July 2013. (*Id.* at ¶¶ 37-38). Information regarding the transactions was not entered into CRISS, and none of the transactions were sent to the Reg E Group for investigation. (*See id.* at ¶¶ 42-45).

Olenak concluded that both Jackson and Gethers had violated PNC's code of ethics by circumventing procedures for processing and approving Jackson's return transactions. (*Id.* at ¶ 46). The code of ethics, which requires employees to "always act in a professional, honest and ethical manner when conducting your activities with and on behalf of PNC," provides:

> We are expected to make sound business decisions in the best interests of PNC, undistorted by personal interests. A conflict exists when personal interests influence decisions that should be made solely on behalf of PNC or its clients.
>
> We must never use our position at PNC for inappropriate personal gain or advantage to us or a member of our family. Any situation that creates a conflict of interest between personal interests and the interests of PNC should be avoided.

(*Id.* at ¶¶ 47-48). While employed by PNC, Jackson reviewed the code of ethics, understood that she had to abide by it, and received annual training on it. (*Id.* at ¶ 49). Olenak recommended to Yates that Jackson and Gethers be terminated, and Yates agreed. (*Id.* at ¶ 50). On August 7, 2013, PNC terminated Jackson and Gethers. (*Id.* at ¶¶ 51, 53).

2. *Facts Regarding Jackson's Allegation that PNC Treated Similarly Situated Employees Differently on the Basis of Race*

Jackson has alleged that in 2007, she processed return transactions for PNC employee Alicia Fletcher ("Fletcher") without either of them losing their jobs. (*Id.* at ¶ 54). Fletcher, who

is African American, first tried to dispute charges on her bank account by going to a retail branch. (*Id.* at ¶¶ 54, 58). Because the retail branch could not help her, Fletcher asked Jackson and Jackson's supervisor at the time, Judith Webster ("Webster"), for assistance. (*Id.* at ¶¶ 55-56, 58). PNC investigated for a code of ethics violation, but found none because: (1) Fletcher first followed PNC's required procedures before going to the ACH Returns Team; and (2) Webster permitted Jackson to approve Fletcher's returns. (*Id.* at ¶¶ 57-60).

Jackson has also averred that Gethers processed return transactions for three other PNC employees who were not terminated. (*Id.* at ¶ 61-62). These employees were: Webster, who is white; Keith Patterson ("Patterson"), who is white; and a third individual whom Jackson and Gethers are unable to identify. (*Id.* at ¶ 62). Jackson and Gethers do not know if these three employees followed proper procedures or received supervisor permission before their return transactions were processed. (*Id.* at ¶ 63). Gethers told no one at PNC except Jackson that she had processed returns for the three employees, and there is no evidence that Yates, or anyone else, knew that Gethers had processed returns for other PNC employees. (*Id.* at ¶ 64).

PNC revealed that it terminated two Pittsburgh-area employees in its Operations department in 2013—besides Jackson and Gethers—for creating conflicts of interest and violating PNC's code of ethics. (*Id.* at ¶ 65). Specifically, PNC fired a white employee for processing a transaction on his own account and an Asian employee for overriding PNC's internal policies and procedures. (*Id.* at ¶¶ 66-67).

   3.   *Facts Related to Jackson's Failure-to-Promote Claim*

Jackson claims that PNC denied her a promotion to the Position on PNC's Reconcilement team due to her race. (*Id.* at ¶ 68). On November 1, 2012, PNC posted the Position on its online-job-posting system. (*Id.* at ¶ 69). Twenty-eight people applied for the Position. (*Id.*

7

at ¶ 70). Jackson was not one of them, even though she knew about and had access to PNC's online system. (*Id.* at ¶¶ 71-72). Jackson alleges that she did not apply for the Position because Yates told her that it was not posted. (*Id.* at ¶ 73). Jackson added that Yates said, "I'll let you know," about the Position and that despite numerous inquiries to Yates about the Position, Yates continued to deny the Position was posted because it needed to be approved. (Docket No. 51-1 at 69-70).

PNC promoted a white woman, Barbara Siko ("Siko"), to the Position on January 14, 2013. (Docket No. 49 at ¶¶ 70, 74). Qualifications required for the Position included: (1) a high school diploma; (2) six-plus years of work experience with "ACH;" (3) subjective skills such as negotiation and sound judgment; and (4) an "expert understanding of departmental procedures and policies and the ability to train/mentor others." (Docket No. 51-7 at 5). Siko began working for PNC in 1998, and Fahrion selected her based on "her prior work experience and qualifications for the position." (Docket No. 49 at ¶¶ 77-78). Siko's job experiences at PNC include work as a teller, as well as numerous positions in PNC's reconcilements department between December 1999 and January 2010.[1] (*Id.*). She then became an Operation Analyst II in January 2010. (*Id.* at 13). As for Jackson's potential qualifications for the Position, she began working at PNC's ACH unit in 1996 as a support clerk and then became a Funds Transfer Representative in the ACH unit in 1999. (Docket No. 51-1 at 11-13). Jackson, who does not know about Siko's qualifications, never told Fahrion about her interest in the Position before Siko's promotion. (Docket No. 49 at ¶¶ 76, 79).

---

[1] Siko worked as a Reconcilement Specialist II from December 1999 to March 2003 and as a Reconcilement Specialist III from March 2003 to January 2010 (spending nearly six years in centralized reconcilements and about one-and-one-half years in electronic settlement reconcilements). (Docket No. 51-7 at 13-14).

**III.     Standard of Review**

A grant of summary judgment is appropriate when the moving party establishes "'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Heffernan v. City of Paterson*, 777 F.3d 147, 151 (3d Cir. 2015) (quoting FED. R. CIV. P. 56(a)). A genuine dispute of material fact is one that could affect the outcome of litigation. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). However, "'[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.'" *N.A.A.C.P. v. N. Hudson Reg'l Fire & Rescue*, 665 F.3d 464, 475 (3d Cir. 2011) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The initial burden is on the moving party to adduce evidence illustrating a lack of genuine disputes. *Hugh v. Butler Cty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). Once the moving party satisfies its burden, the non-moving party must present sufficient evidence of a genuine dispute in rebuttal. *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 587). When considering the parties' arguments, the Court is required to view all facts and draw all inferences in the light most favorable to the non-moving party. *Id.* (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Further, the benefit of the doubt will be given to allegations of the non-moving party when in conflict with the moving party's claims. *Bialko v. Quaker Oats Co.*, 434 F. App'x 139, 141 n.4 (3d Cir. 2011) (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995)).

Nonetheless, a well-supported motion for summary judgment will not be defeated where the non-moving party merely reasserts factual allegations contained in the pleadings. *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010) (citing *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989)). The non-moving party must resort to affidavits, depositions, admissions, and/or interrogatory answers to demonstrate the existence of a genuine dispute. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 773 (3d Cir. 2013) (citing *Celotex Corp.*, 477 U.S. at 324).

## IV. Discussion

Jackson's Title VII action alleges PNC discriminated against her on the basis of race through her termination and its failure to promote her. Unless there is evidence of direct discrimination, claims under Title VII are analyzed under the burden-shifting framework created in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973). This framework requires that Jackson establish a prima facie case by demonstrating that: (1) she is a member of a protected class; (2) she is qualified for the position; (3) she was subject to an adverse employment action despite being qualified; and (4) the adverse employment action occurred in a manner raising an inference of unlawful discrimination. *See id.* at 802. The Court determines whether a plaintiff establishes a prima facie case as a matter of law. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003).

If a plaintiff successfully establishes a prima facie case, the burden shifts to the employer to articulate a legitimate non-discriminatory reason ("LNDR") for the adverse employment action. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). Once the employer does so, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons proffered by the employer were merely a pretext for discrimination, and not the true

10

motivation for the adverse employment action. *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

A.  **Termination on the Basis of Race**

The parties do not dispute that Jackson has presented sufficient evidence to establish the first three elements of her prima facie case because: (1) she is African American and a member of a protected class; (2) she was qualified for her former position as a Funds Transfer Representative on PNC's ACH Returns team; and, (3) her termination constitutes an adverse employment action. (*See* Docket No. 48 at 12-13 (wherein PNC argues that its Motion must be granted because Jackson cannot establish the fourth element of her claim)). Thus, the sole prima facie element in dispute is whether Jackson has met her burden on the fourth element.

Jackson contends that she produced sufficient evidence from which a reasonable jury could infer that similarly situated persons outside of her protected class (her comparators) were treated more favorably. It is Jackson's burden at the summary judgment stage to do so. *See Warfield v. SEPTA*, 460 F. App'x 127, 130 (3d Cir. 2012). "[T]he question of whether other employees are 'similarly situated' is fact-intensive," *Sims v. Court of Common Pleas of Allegheny County*, No. 10-CV-151, 2010 U.S. Dist. LEXIS 103454, at *10 (W.D. Pa. Sept. 30, 2010), but it is a question of law. *Sarullo*, 352 F.3d at 797. "Though 'similarly situated' does not mean 'identically situated,' a plaintiff must demonstrate that she is similar to the alleged comparator in relevant respects." *Id.* (quoting *Kosereis v. Rhode Island*, 331 F.3d 207, 214 (1st Cir. 2003)). The test on whether the comparators were treated more favorably focuses "on the particular criteria or qualifications identified by the employer as the reason for the adverse action." *Simpson v. Kay Jewelers*, 142 F.3d 639, 647 (3d Cir. 1998); *see also Warfield*, 460 F.

App'x at 130 (quoting same). Federal courts employ many factors when weighing whether an employer treated comparators better than a plaintiff.

> Context matters in assessing the factors relevant to the inquiry of whether two employees are similarly situated. In this particular context—workplace disciplinary and/or personnel actions—relevant factors include a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."

*McCullers v. Napolitano*, 427 F. App'x 190, 195 (3d Cir. 2011) (quoting *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)) (citation omitted); *see also Nguyen v. AK Steel Corp.*, 735 F. Supp. 2d 346, 361 (W.D. Pa. 2010) (recognizing same general legal principles); *Epps v. First Energy Nuclear Operating Co.*, No. 11-CV-1462, 2013 U.S. Dist. LEXIS 41140 (W.D. Pa. Mar. 25, 2013) (same).

Considering these legal principles, the Court now looks to the record evidence as to Jackson's termination. PNC terminated Jackson and Gethers simultaneously for circumventing PNC's regulations on ACH transactions such that no information about the transactions entered the CRISS system. (Docket No. 49 at ¶ 28). PNC's Reg E Group thus could not refer to the CRISS system to evaluate or approve Jackson's ACH transactions for processing. (*Id.*). The investigation discovered a pattern of Jackson and Gethers evading PNC's ACH procedures at least nine times. (*Id.* at ¶¶ 37-38).

The fact that two African-American employees were terminated for the same misdeed does not raise an inference of unlawful discrimination. Jackson and Gethers were similarly situated employees in that they are African Americans, (*id.* at ¶¶ 1, 5), and were "subject to the same standards" because PNC fired them both. *McCullers*, 427 F. App'x at 195 (internal

quotations omitted). However, these facts, by themselves, create no inference of unlawful racial employment discrimination.

No record evidence shows that PNC treated non-African-American employees who evaded the ACH transaction rules differently than it treated Jackson and Gethers in 2013. *McDonnell Douglas*, 411 U.S. at 802 (holding that a plaintiff must show that the adverse employment action raised an inference of unlawful discrimination to show a prima facie case). To make a prima facie case, Jackson must show that "similarly situated individuals outside . . . [her] class were treated more favorably." *Blackwell-Murray v. PNC Bank*, 963 F. Supp. 2d 448, 463 (E.D. Pa. 2013) (quoting *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 273 (3d Cir. 2010)). Jackson alleged that in 2007, she processed return transactions for fellow PNC employee Fletcher and both retained their jobs. (Docket No. 49 at ¶ 54). Fletcher is also African American. (*Id.*). This does not raise an inference of unlawful-employment discrimination because Fletcher and Jackson are in the same racial class. *See Anderson*, 621 F.3d at 273 (holding that a valid comparator must be outside plaintiff's protected class). Further, PNC cleared Fletcher and Jackson of wrongdoing because Fletcher first sought assistance in making an ACH return transaction from a PNC retail branch and Jackson's supervisor, Webster, permitted Jackson to process the transaction. (Docket No. 49 at ¶¶ 55-60). The circumstances regarding Jackson processing ACH return transactions for Fletcher in 2007 thus differ enough from Jackson circumventing PNC's procedures with Gethers's help in 2013 that the situations are not comparable to establish a prima facie case. *McCullers*, 427 F. App'x at 195 (internal quotations omitted).

Jackson also averred that Gethers processed return transactions for three other PNC employees who were not terminated. (Docket No. 49 at ¶¶ 61-62). These employees were:

13

Webster, who is white; Patterson, who is white; and a third individual Jackson and Gethers are unable to identify. (*Id.* at ¶ 62). It is Jackson's burden to show that she and her chosen comparators are "similarly situated" and that PNC treated them more favorably. *See Warfield*, 460 F. App'x at 130. Jackson did not satisfy this burden. She produced no record evidence showing that Webster, Patterson, and the unnamed third employee disobeyed PNC's ACH-transaction procedures before processing their return transactions. (Docket No. 49 at ¶ 63). Further, no evidence shows that a PNC decision-maker punished these employees differently or even knew about their alleged violations. Gethers told no one at PNC except Jackson that she processed returns for these three employees. (*Id.* at ¶ 64). Thus, there is no evidence of disparate treatment due to race.

Jackson also seemingly argues that Yates, who was allegedly present while Jackson and Gethers performed Jackson's ACH return transaction, should have stopped them from breaking PNC's code of ethics. (Docket No. 51-1 at 52). This argument is irrelevant because it does not help Jackson prove her prima facie case. There is no evidence showing that Yates or PNC treated similarly situated non-African-American employees differently. *See McCullers*, 427 F. App'x at 195 (internal quotations omitted) (describing the factors courts should weigh in determining whether employees are similarly situated in the workplace-discipline context). Further, Jackson has no evidence that Yates approved Gethers's and her evasion of the rules. Therefore, even if Yates was physically near Jackson and Gethers as they processed Jackson's ACH return transactions and did not stop them from violating the code of ethics, this has no relevance in Jackson's Title VII action against PNC.

The undisputed record shows that PNC terminated non-African-American employees for infractions similar to what Jackson and Gethers did in 2013. PNC terminated two other

14

Pittsburgh-area employees in its Operations department in 2013 for creating conflicts of interest and violating the code of ethics. (Docket No. 49 at ¶ 65). PNC fired a white employee for processing a transaction on his own account and an Asian employee for overriding internal policies and procedures. (*Id.* at ¶¶ 66-67). The record evidence shows that PNC terminates employees for code of ethics violations regardless of race. In sum, no reasonable jury could conclude on this record that Jackson was fired due to her race. Therefore, the Court will grant PNC's motion for summary judgment as to Jackson's Title VII unlawful-termination claim.

## B. Failure to Promote

Jackson's claim that PNC racially discriminated against her by not promoting her to the Position will survive summary judgment, despite Jackson not applying for it. Establishing a failure-to-promote claim under Title VII for racial discrimination requires the same burden-shifting framework employed in *McDonnell Douglas*, 411 U.S. at 802. Jackson must demonstrate the following elements: (1) she belongs to a protected class; (2) she applied and was qualified for a job that the employer sought applicants for; (3) she was rejected despite her qualifications; and (4) after her rejection, the position remained open and the employer continued to seek similarly qualified applicants. *Id.* Despite Jackson producing little to no record evidence in opposition to PNC's summary-judgment motion, due to her pro se status, the court reviewed the complete record to determine if she could make out a prima facie case. *See Clark v. Sewritas Sec. Servs.*, No. 08-CV-6356, 2010 U.S. Dist. LEXIS 111987, at *6 (D.N.J. Oct. 19, 2010) ("Although Plaintiff failed to submit opposition papers to the instant motion, in light of her pro se status, the Court has reviewed the complaint and the entire record evidence in an attempt to identify evidence of pretext.").

Federal courts tend to strictly enforce the job-application element in failure-to-promote claims when employers use a formal-hiring process, such as posting open positions. *See Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1345 (11th Cir. 2003); *Wagner v. G.A. Gray Co.*, 872 F.2d 142, 145-46 (6th Cir. 1989); *Box v. A & P Tea Co.*, 772 F.2d 1372, 1376 (7th Cir. 1985); *Kinsella v. Rumsfeld*, 320 F.3d 309, 314 (2d Cir. 2003). "In such a circumstance, the employee's general requests for advancement are insufficient to support a claim for failure to promote." *Williams v. Giant Food Inc.*, 370 F.3d 423, 430 (4th Cir. 2004).

Establishing a prima facie failure-to-promote case is simpler if a plaintiff alleges unlawful discrimination in the application process for a promotion. If a plaintiff seeking a promotion "made every reasonable attempt to convey his interest in the job to the employer," then "the failure to formally apply . . . will not bar a Title VII plaintiff from establishing a prima facie claim." *E.E.O.C. v. Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir. 1990). But, federal courts tend to loosen the application requirement when employers use an informal hiring process. *See id.* at 349; *Mauro v. So. New England Telecomms., Inc.*, 208 F.3d 384, 387 (2d Cir. 2000). In *Metal Service*, the employer hired workers either through a formal application process controlled by an employment agency or an informal word-of-mouth hiring process. *Metal Serv.*, 892 F.2d at 343, 350. The Third Circuit Court of Appeals concluded that two African-American men stated a prima facie case of unlawful employment discrimination due to race, despite the district court's conclusion that the men did not formally apply to the employer, because they were forced to apply through an external employment agency while white employees were hired through word-of-mouth practices. *Id.* at 344-45, 350-51.

There is no dispute that Jackson did not apply for the Position. PNC posted the Position on its online-job-posting system on November 1, 2012. (Docket No. 49 at ¶ 69). By posting the

16

Position online, PNC created a formal-hiring process. *Smith*, 352 F.3d at 1345. Jackson knew that she could apply for jobs on PNC's online system but was not one of the twenty-eight applicants for the Position. (Docket No. 49 at ¶¶ 69-70, 72).

Jackson's failure to apply to the Position is not fatal to her failure-to-promote claim. Although PNC implemented a formal hiring process, Jackson's burden to prove a prima facie case is loosened because, when construing the facts in the light most favorable to her, a reasonable jury could find that she did not apply for the Position because Yates discriminated against her through the hiring process. *Metal Serv. Co.*, 892 F.2d at 348; *Santini*, 795 F.3d at 416 (citing *Diebold, Inc.*, 369 U.S. at 655). No Third Circuit precedent precludes this result. Under *Metal Service Co.*, Jackson must show that she "made every reasonable attempt to convey [her] interest in the job to the employer." *Metal Serv. Co.*, 892 F.2d at 348.

Here, the record facts indicate that Jackson did so. *Id.* Despite Jackson repeatedly asking Yates whether the Position was posted online, Yates continually denied that the Position was posted, stating that "Duane has to approve it yet, but I'll let you know." (Docket No. 51-1 at 69). Jackson then arrived at work, after taking one business day off, to find that PNC had promoted a white woman, Siko, to the Position. (*Id.* at 69-71). Although she admitted that she did not know the role Yates actually played in posting the Position, Jackson noted in her deposition that "[Yates] just told me [that] she didn't post it yet." (*Id.* at 70). At this stage, the Court will accept Jackson's deposition testimony indicating that she "made every reasonable attempt to convey [her] interest in the job to the employer." *Metal Serv. Co.*, 892 F.2d at 348.

Jackson's deposition testimony raises a genuine issue of material fact for trial as to whether Yates prevented Jackson from applying for the Position on the basis of race. Neither Yates nor PNC rebutted Jackson's allegation that Yates repeatedly told her that the Position was

17

not posted. Even if Yates or PNC rebutted this accusation, a genuine issue of material fact would remain for trial. *Bialko*, 434 F. App'x at 141 n.4 (citing *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995) (giving the benefit of the doubt to the non-moving party when factual disputes with the moving party occur in the summary-judgment context)). A reasonable jury could infer that Yates intentionally informed Jackson that the Position was not posted so that Jackson would not check online for the posting or apply for the Position. *Santini*, 795 F.3d at 416 (citing *Diebold, Inc.*, 369 U.S. at 655). After all, Yates was Jackson's supervisor, (Docket No. 49 at ¶ 7), and she initially notified Jackson about the Position, (Docket No. 51-1 at 69). Viewing these record facts in the light most favorable to Jackson, a reasonable jury could further infer that Jackson trusted the accuracy of the information she received from Yates, and that Yates abused that trust by deceiving Jackson about whether the Position was posted. *Santini*, 795 F.3d at 416 (citing *Diebold, Inc.*, 369 U.S. at 655). The Court will not grant summary judgment on Jackson's failure-to-promote claim just because Jackson failed to formally apply to the Position.

Jackson proved all of the prima facie elements of her failure-to-promote claim. She satisfies the first element because, as an African American, she belongs to a protected class. (Docket No. 49 at ¶ 1); *McDonnell Douglas*, 411 U.S. at 802. Although she was not rejected for the Position, she meets the third and fourth elements[2] because PNC did not consider her application due to alleged discrimination in the hiring process, meaning that PNC could not formally reject her. Jackson also proved the second element, despite not formally applying for the Position, because a reasonable jury could conclude she was qualified for the Position. Qualifications required for the Position included: (1) a high school diploma; (2) six-plus years of

---

[2] The third prima facie element is that Jackson was rejected despite her qualifications and the fourth element is that after her rejection, the position remained open and the employer continued to seek similarly qualified applicants. *McDonnell Douglas*, 411 U.S. at 802.

work experience with "ACH"; (3) subjective skills such as negotiation and sound judgment; and (4) an "expert understanding of departmental procedures and policies and the ability to train/mentor others." (Docket No. 51-7 at p. 5). Jackson began working in PNC's ACH unit in 1996 as a support clerk and then became a Funds Transfer Representative in the ACH unit in 1999. (Docket No. 51-1 at 11-13). She also "helped write" the procedures for handling ACH disputes, which could lead a reasonable jury to conclude that she had an expert understanding of them. (*Id.* at 28-29). Although no record evidence shows that Jackson had a high school diploma or that she possesses strong negotiation skills and sound judgment, these traits could be implied through Yates approaching Jackson and telling her about the Position. (*Id.* at 69). The evidence is enough for a reasonable jury to conclude that Jackson presents a prima facie case for PNC's failure to promote her on the basis of race and that Yates prevented her from applying because of race.

**V.     Conclusion**

For the foregoing reasons, PNC's summary judgment motion (Docket No. 47) will be granted as to Jackson's unlawful-termination claim but will be denied as to her failure-to-promote claim under Title VII.

An appropriate Order follows.


Dated:  December 16, 2016                                  *s/Nora Barry Fischer*
                                                          Nora Barry Fischer
                                                          United States District Judge


cc:     All Counsel of Record